# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CUTHILL & EDDY, LLC and
HARRY E. HARP,

    Plaintiffs,

v.                                    Case No.   6:09-cv-1779-Orl-35GJK

CONTINENTAL CASUALTY
COMPANY,

    Defendant.
_____/

# ORDER

**THIS CAUSE** comes before the Court for consideration of Defendant Continental Casualty Company's ("Defendant CCC") Motion for Summary Judgment (Dkt. 36); Plaintiffs' Memorandum in opposition thereto (Dkt. 44); Plaintiffs' Motion for Summary Judgment (Dkt. 37); Defendant CCC's Response in Opposition thereto (Dkt. 46); and the parties' Reply Memoranda.  (Dkts. 51, 52)  Upon consideration of all relevant filings and case law and being otherwise fully advised, the Court hereby **GRANTS** Defendant CCC's Motion (Dkt. 36), and **DENIES** Plaintiffs' Motion (Dkt. 37), as described herein.

**I.**    **BACKGROUND**

    **A. Undisputed Facts**

The following facts are undisputed in this case:

The instant action is a coverage dispute that arises out of insurer Defendant CCC's refusal to defend or indemnify insured Plaintiffs against an underlying state court

malpractice claim brought for alleged professional negligence in Plaintiffs' handling of the tax returns of the Partin family.  (Dkt. 36 at 9; Dkt. 37 at 5-9; Dkt. 38-1 at 7)  The Partins[1] were longtime clients of Plaintiffs, having hired Plaintiff Harp as their accountant in 1994 and continuing to use his services when he became a partner at Plaintiff Cuthill & Eddy LLC ("Plaintiff C&E" or "C&E"), an accounting firm, in 1996.  (Dkt. 38-1 at 5-6; Dkt. 38-4 at 9-10)  Defendant CCC issued a claims-made professional liability insurance policy (the "First Policy") to Plaintiff C&E for a policy period running from August 1, 2005 to August 1, 2006.  (Dkt. 47 at 1)  On March 16, 2006, Ms. Partin sent letters to Plaintiff Harp and Carson Eddy, a partner at Plaintiff C&E, stating that the Partins decided to change accounting firms.  (Dkt. 36-10 at 2; Dkt. 36-11 at 2; Dkt. 37-1 at 2; Dkt. 47-1 at 44, 46)  On April 13, 2006, Mr. Eddy responded to Ms. Partin's letter, expressing a desire to continue representing the Partins through 2006.  (Dkt. 47-1 at 48-50)  During April 2006, Mr. Eddy and Ms. Partin exchanged e-mails attempting to schedule a meeting that ultimately never transpired.  (Dkt. 47-1 at 52-58)

On April 21, 2006, Kim Cullen, Esq., counsel for the Partins, sent a letter to Mr. Eddy.  (Dkt. 47 at ¶ 13; Dkt. 47-1 at 62-92)  The letter stated, <u>inter alia</u>:

> I had the privilege of meeting today with a wonderful lady named Janet Partin. . . . [M]y meeting with Mrs. Partin concerned her extreme dissatisfaction with the accounting work provided to her by Mr. Harp – to the point where Mrs. Partin has shared with me accounts of several acts or omissions that seem obvious to me to rise to the level of professional malpractice.
> . . . .
>
> [P]lease consider this letter our formal request that you provide a copy of this correspondence to your malpractice or errors & omission carrier, and

---

[1] The Partin family owns Partin & Partin Heart Bar Ranch, a subsidiary of the Partin & Partin Family Partnership, as well as the MJP Trust, the Partin Children's Voting Trust, Laughrey Children's Trust, and the Steve Partin Trust.  (Dkt. 38-1 at 6-7)

>ask the carrier to contact us as soon as possible. In the event that your firm is self-insured, we would appreciate you letting us know as soon as possible. As with all insurance matters, failure to report this potential claim to your carrier in a timely fashion could cause your carrier to deny liability coverage under your insurance policy and place your form or individual assets at risk.

(Dkt. 47-1 at 63)

Plaintiffs claim that they reported this letter to Sandy Garrick, Plaintiff C&E's insurance broker at Huckleberry Sibley & Harvey Insurance. Specifically, Plaintiffs claim that Mr. Eddy contacted Sandy Garrick upon receipt of the April 21, 2006 letter and asked whether it was necessary to notify C&E's errors and omissions carrier about the letter. (Dkt. 37 at 3) Garrick testified at her deposition that Carson Eddy never called her about the Cullen letter and that she first saw the letter in March 2007 after Defendant CCC declined coverage for the underlying action.² (Dkt. 36 at 7 n.3) The parties agree, however, that on May 3, 2006, Ms. Garrick faxed Mr. Eddy a copy of the Policy's coverage form. (Dkt. 47 at 3; Dkt. 47-1 at 65-79) On the fax cover page, Ms. Garrick wrote: "Page 9 includes your duties in the event of a claim or potential claim." (Id. at 65)

On May 2, 2006, C&E partner Todd Hitchins sent an e-mail to other C&E partners with "Partin Settlement Issues" in the subject line. (Dkt. 36-18 at 2; Dkt. 47-1 at 83) Mr. Hitchins's e-mail expressed four concerns over the ongoing Partin issues and stated, "My biggest concern – what is our obligation to the insurance company. . . . who pays for the defense and any damages?" (Id.)

---

² Plaintiffs point to evidence disclosed after the deposition which appears to call this testimony into doubt. Notably, Plaintiffs identify computerized records kept by the agency that suggest that Ms. Garrick had a telephone conversation with Mr. Eddy on May 3, 2006, regarding the letter. (Dkt. 39-1 at 12.) While Plaintiffs' evidence in this regard is sufficient to raise an issue of fact, for reasons set forth infra at page 14, this factual dispute does not preclude the entry of summary judgment.

Plaintiff C&E renewed its insurance policy with Defendant CCC under Accountants Professional Liability Policy No. 128535142 (the "Second Policy"), a claims-made policy that is substantively similar to the First Policy and provided coverage for a period incepting on August 1, 2006 and terminating on August 1, 2007. (Dkt. 47 at 1) Under the Second Policy, Defendant CCC agreed to provide coverage for claims made against Plaintiff C&E, provided that, "prior to the effective date of this Policy, none of [Plaintiff C&E's employees] had a basis to believe that any . . . act or omission, or interrelated act or omission, might be reasonably be expected to be the basis of a claim." (Dkt. 47-1 at 6, 7) Plaintiff C&E did not report the April 21, 2006 letter to Defendant CCC in connection with the renewal of the Second Policy. (Dkt. 47 at 4)

On January 11, 2007, C&E partners Carson Eddy and Todd Hitchins met with Ms. Partin and discussed her allegations of malpractice. (Dkt. 47 at ¶ 24) On January 11, 2007, Plaintiff C&E notified Sandy Garrick in writing of the issues raised by Ms. Partin at the January 11, 2007 meeting and specifically stated that Plaintiff C&E wished to give "notification to our insurance carrier . . . although suit is not imminent[.]" (Dkt. 47-1 at 90) Ms. Garrick forwarded the January 11, 2007 letter to Defendant CCC via e-mail on January 26, 2007. (Dkt. 47-1 at 92) On April 16, 2007, Defendant CCC denied coverage on the grounds that the claim was first made prior to the Policy's inception date of August 1, 2006 and, in the alternative, that the claim fell outside the Policy's coverage because Plaintiffs had knowledge prior to the Second Policy's effective date of acts or omissions by Plaintiff Harp that might reasonably be expected to be the basis of a claim. (Dkt. 47 at ¶ 29)

On October 18, 2007, the Partins sued Plaintiffs in state court for professional negligence in the handing of the several Partin family accounting matters.  (Dkt. 47 at 2; Dkt. 47-1 at 29-37)   Plaintiffs and the Partins settled the state court action on confidential terms in August 2009.  (Dkt. 8 at 3; Dkt. 36 at 9; Dkt. 37 at 8; Dkt. 47 at 4)

**B. Case History**

Plaintiffs filed the instant action for breach of contract on October 20, 2009.[3]  (Dkt. 1)  In their Second Amended Complaint, Plaintiffs allege that Defendant breached its duties under the Second Policy by denying coverage.  (Dkt. 8 at 2-3)   On December 10, 2009, Defendant CCC filed a counterclaim for declaratory relief, seeking a determination that the underlying claim is not covered by the Second Policy it issued to Plaintiff C&E. (Dkt. 20 at 5-14)

Defendant CCC filed a Motion for Summary Judgment contending that Plaintiffs' claims for relief fail as a matter of law because Plaintiffs cannot meet two independent conditions precedent to coverage under the Second Policy.  (Dkt. 36 at 13-24) Specifically, Defendant contends no coverage is available under the terms of the Second Policy since (1) several partners at Plaintiff C&E had a basis to believe, prior to the policy's inception date, that Plaintiff's Harp's acts or omissions in connection with the Partins' representation might reasonably be expected to be the basis of a claim, and (2) the claim was first made prior to the effective date of the policy.  (Id.)

Plaintiffs also filed a Motion for Summary Judgment contending that they are entitled to summary judgment because (1) prior to the inception date of the Second

---

[3] Plaintiff C&E filed its Complaint on October 20, 2009 and an Amended Complaint on October 21, 2009. (Dkt. 1; Dkt. 2)  On November 5, 2009, a Second Amended Complaint was filed, with the addition of Harry E. Harp as a party Plaintiff.  (Dkt. 8 at 1)

5

Policy, Plaintiffs had no basis to believe that services provided by them to the Partins might reasonably be expected to be the basis of a claim and (2) that no claim was made prior to the effective date of the Second Policy.  (Dkt. 37 at 13-22)  Plaintiffs also raise an alternative argument in their Opposition to Defendant's Motion for Summary Judgment.  Plaintiffs claim that, even if the Court finds that a claim was made prior to the effective date of the Second Policy, the claim is covered under the First Policy and Plaintiffs timely reported the claim to CCC during the First Policy period through an insurance broker, Huckleberry, Sibley, Harvey Insurance Agency, which Plaintiffs contend was CCC's agent.  (Dkt. 44 at 3.)

In its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, Defendant reiterates arguments set forth in its Motion for Summary Judgment.  (See Dkt. 46.)  Defendant CCC additionally asserts in its Reply that Plaintiffs' alternative theory for recovery fails because the First Policy expressly requires Plaintiffs to report any claim or potential claim directly to Defendant, and it expressly provides that an insurance agent or broker is not authorized to accept notice of claims under the terms of the subject policy. (Dkt. 51.)

## II.  LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).  Which facts are material depends

on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Forman, 509 F.3d at 1356). A moving party discharges its burden by showing that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").

In the context of cross motions for summary judgment, the denial of one does not require the grant of another. Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008) Summary judgment is always inappropriate if disputes remain as to any material facts. Id. at 1298.

### B. Contract Interpretation

As noted by the parties, "[t]he interpretation of an insurance contract is a question of law." Kattourn v. N.H. Indem. Co., 968 So.2d 602, 604 (Fla. 2d DCA 2007). It is

undisputed that Florida law governs the interpretation of Defendant's insurance policy in this case. (Dkt. 36 at 12-13; Dkt. 37 at 11-12) "Florida law provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." Auto-Owners Ins. Co., v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). Accordingly, the scope and extent of coverage are determined by the language and terms of the policy, and the policy terms are given their plain and ordinary meaning. "It is a cardinal principle of insurance law that where the provisions of an insurance policy are clear and unambiguous, the terms of the policy will be accorded their plain meaning and enforced as written." Ernie Haire Ford, 541 F. Supp. 2d at 1298; see also Northland Cas. Co. v. HBE Corp., 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001)

Courts routinely affirm the denial of coverage where an insurance policy contains an unambiguous "prior knowledge" provision and where an insured has knowledge, prior to the effective date of the policy, of acts or omissions that might reasonably provide the basis for a claim. See, e.g., Lawyers Prof'l Liab. Ins. Co. v. Dolan, Fertig & Curtis, 524 So. 2d 677, 678 (Fla. 4th DCA 1988) (holding prior knowledge provision clearly and unambiguously barred coverage for claim of which insureds were aware before policy's effective date); Coregis Ins. Co. v. McCollum, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997) (same). However, if the asserted policy language is susceptible of more than one reasonable interpretation, the policy is considered ambiguous and strictly construed against the policy's drafter. Anderson, 756 So. 2d at 34. "[E]xclusionary clauses are construed even more strictly against the insurer than coverage clauses." Id. While the insured has the burden of proving that a claim against it is covered by the insurance

policy, the insurer has the burden of proving an exclusion to coverage. LeFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997). According to the majority view, the burden of proving an exception to a policy exclusion is on the insured. Id.

## III. DISCUSSION

The Court finds that Plaintiffs failed to notify Defendant CCC of a claim or potential claim prior to the expiration of the First Policy and therefore cannot avail themselves of coverage under that policy. The Court additionally finds that, prior to the effective date of the Second Policy, partners of Plaintiff C&E had knowledge that Plaintiff Harp's acts or omissions in connection with the Partins' representation might reasonably be expected to be the basis of a claim. As such, the Court finds that coverage is excluded under the terms of the Second Policy. Because coverage is unavailable as a matter of law under both policies and because no material disputes of fact remain to be adjudicated, Defendant CCC is entitled to summary judgment.

### A. Plaintiffs Failed to Report a Claim During the First Policy Period

As a preliminary matter, the Court must resolve Plaintiffs' argument (raised for the first time in their Opposition to Defendant CCC's Motion for Summary Judgment) that Plaintiff C&E reported the April 21, 2006 letter to Defendant CCC during the First Policy period by virtue of its claimed communication with the insurance broker, Huckleberry Sibley & Harvey. (Dkt. 44 at 3) Plaintiffs argue that Huckleberry Sibley & Harvey is authorized by the insurer to act as the insurer's agent for the purposes of receiving communications from the insured concerning claims. (Dkt. 44 at 3) Thus, Plaintiffs contend that, even if the Court finds that the April 21, 2006 letter is a claim, coverage

exists under the First Policy because Plaintiffs reported the letter to Defendant CCC. (Dkt. 44 at 3)   The Court finds no merit in this argument.

Section VI, subsection C, of the First Policy, entitled "Duties in the event of a claim," provides that "You must give us written notice as soon as reasonably possible during the policy period of any claim made against you." [4]   (Dkt. 47-1 at 4)   That subsection further requires that the insured "immediately forward all documents received in connection with the claim to us."   (Dkt. 47-1 at 4) Section VI, subsection D, of the First Policy, "Duties in the event of a potential claim," additionally provides:

> If, during the policy period, you become aware of an act or omission that may reasonably be expected to be the basis of a claim against you, you must give written notice to us prior to the expiration of the policy period. Such notice must state the reasons for anticipating a claim, with full particulars, including but not limited to:
> 1. the specific act or omission;
> 2. the dates and persons involved;
> 3. the identities of anticipated or possible claimants;
> 4. the circumstances by which you first became aware of the potential claim.
>
> If such notice is given, then any claim that is subsequently made against you and reported to use shall be deemed to have been made at the time such written notice was received by us.
>
> In the event we determine there is an opportunity to avoid a claim arising out of a potential claim you have reported to us and we incur legal or expert expenses to do so, such expense will be at our cost and not be subject to your deductible.

(Dkt. 47-1 at 74-75)

---

[4] The First Policy states that the term "us" refers to "the Stock Insurance Company, named on the Declarations, providing this insurance."  (Dkt. 47-1 at 66)   The Court therefore finds that "us," as used in the First Policy, refers to Defendant CCC, whom the parties stipulate issued the First Policy.

The following subsection, "E. Notice," states that "Notice of any claim or potential claim should be reported to Director of Claims, Accountants Professional Liability, CNA, CNA Plaza, 333 South Wabash Street, Chicago, Illinois 60604." (Dkt. 47-1 at 75) The next subsection, "F. Changes/Transfer of Interest," further provides:

> Notice to any of our agents or knowledge possessed by any such agent or any other person shall not act as a waiver or change in any part of this policy. You agree to first obtain our written consent to make any changes transfers or assignments of this Policy. None of the provisions of this Policy will be waived, changed or modified except by written endorsement issued to form a part of this Policy.

(Dkt. 47-1 at 75)

The Court finds that these policy provisions manifest an unambiguous intention on the part of Defendant CCC to limit any latent liability that could arise from an agent's delay in reporting a claim or potential claim or failure to report a claim or potential claim at all. The First Policy includes an express provision informing the insured of the procedure for reporting a claim: "You must give us written notice as soon as reasonably possible during the policy period of any claim made against you." (Dkt. 47-1 at 4) Likewise, in the event of a potential claim, an insured is required to provide "written notice to us prior to the expiration of the policy period." The First Policy also explicitly informs the insured where to send that notice: "Notice of any claim or potential claim should be reported to Director of Claims, Accountants Professional Liability, CNA, CNA Plaza, 333 South Wabash Street, Chicago, Illinois 60604." Finally, the policy states: "Notice to any of our agents or knowledge possessed by any such agent or any other person shall not act as a waiver or change in any part of this policy." (Dkt. 47-1 at 75) These policy provisions

11

required Plaintiffs to notify Defendant CCC and not an agent of Defendant CCC to report a claim or potential claim under the policy.  Plaintiffs agreed to these terms when they contracted with Defendant CCC to purchase the First Policy.

Plaintiffs nevertheless contend that the Court should ignore the procedures set forth in the First Policy for reporting a claim or potential claim.  Instead, Plaintiffs request that the Court give exclusive force to a policy endorsement that governs "PREMIUM OR CLAIM DISPUTES."  (44-1 at 7)  The endorsement provides that "Should you have a dispute concerning your premium or about a claim, you should contact your agent or the company."  (Dkt. 44-1 at 7)  According to Plaintiffs, this endorsement form "expressly directs the insured to contact either the agent . . . or the insurance company directly, in the event of a 'dispute about a claim.'"  (Dkt. 44 at 13)  Plaintiffs maintain that they simply exercised the option of reporting this "dispute about a claim" to Sandy Garrick instead of reporting it to Defendant CCC.  (Dkt. 44 at 13)

The Court finds that the cited language of the endorsement has no bearing on this issue and reliance on it by the Plaintiffs is wholly misplaced.  The First Policy clearly describes the steps required of Plaintiffs in the event that they needed to notify Defendant CCC of a claim.  Nothing in the endorsement suggests that its terms alter or supersede the notice requirement contained in the First Policy.  The Court finds that the endorsement only gives the insured instruction regarding the manner in which to resolve disputes *about* claims.  As for notification of the existence of a claim or potential claim in the first instance, the policy plainly required Plaintiffs to notify Defendant CCC directly. The argument that they notified Defendant CCC though Sandy Garrick, even if the

asserted facts concerning the content and timing of that notification are accepted as true, fail as a matter of law to constitute notice being provided as required by the Policy.

Plaintiffs' reliance on the doctrine of apparent authority is also unavailing. Under Florida law, the doctrine of apparent authority provides that an insurer should be bound by the acts of a producing agent whom the insurer has clothed with apparent authority to bind it. Am. Cas. Co. of Reading, Pa. v. Castellanos, 203 So. 2d 26, 27 (Fla. 3d DCA 1967). Plaintiffs rely exclusively on the Castellanos decision in support of their argument that Huckleberry Sibley & Harvey had apparent authority to receive a communication regarding claims.

The Castellanos decision is inapplicable to this matter. The policy at issue in Castellanos allowed for an insured to notify "the company *or any of its authorized agents*" of a claim. Id. (emphasis in original). The policy at issue here did not permit Plaintiffs to notify an agent in the event of a claim. To the contrary, Plaintiffs were, as noted, required to notify Defendant CCC if they faced a claim or potential claim. Moreover, by contractually agreeing that "knowledge possessed by any such agent" could not "act as a waiver or change in any part of this policy" (Dkt. 47-1 at 75), Defendant CCC and Plaintiffs agreed that an insurance agent or broker would *not* be cloaked with the authority to alter any terms of the policy, including the requirement that notice of claims be provided directly to Defendant CCC. See Joseph v. Zurich Life Ins. Co. of Am., 159 F. App'x 114, 118 (11th Cir. 2005) (Florida insurance law "recognizes that an agent cannot waive a provision of an insurance contract or bind the insurer when the insurance application makes clear that the agent has no authority to do so"); see also Steele v. Jackson Nat'l

Life Ins. Co., 691 So. 2d 525, 528 (Fla. 5th DCA 1997) (agent had no apparent authority to explain whether insured's medical history would be "significant" to the insurer because the policy provided that an agent will not have authority to "make, alter or discharge any contract or any terms, rates or conditions of the Company's policies or contracts"); Murphy v. John Hancock Mut. Life Ins. Co., 213 So. 2d 275, 276 (Fla. 3d DCA 1968) (statement of an agent cannot bind an insurance company to a contract when the written insurance application expressly states that the agent cannot so contract).

Thus, even if Sandy Garrick were acting as Defendant CCC's agent for certain purposes, and even if she had apparent authority for certain purposes, and even if Plaintiffs immediately turned over the April 21, 2006 letter to her, Plaintiffs' claim for coverage under the First Policy fails because the policy put Plaintiffs on notice that Ms. Garrick did not have authority to receive notification regarding a claim or a potential claim on behalf of Defendant CCC.  Accordingly, any factual dispute related to what was or was not communicated to Sandy Garrick is immaterial because, in the absence of proper notification to Defendant CCC in the manner required under the First Policy,[5] no coverage is available under this claims-made policy.

## B.   Plaintiffs' Prior Knowledge about the Circumstances Giving Rise to the Partin Claim Precludes Recovery under the Second Policy

The Court additionally finds that Plaintiffs cannot recover under the Second Policy because, prior to its inception, employees of Plaintiff C&E had knowledge of acts and/or omissions related to the Partins' representation that might reasonably have been

---

[5] The record contains no evidence that Sandy Garrick gave actual or constructive notice to CNA or Defendant CCC during the First Policy period, and no party to this action contends otherwise.

14

expected to form the basis of a claim.  Defendant issued the Second Policy to Plaintiff C&E, effective August 1, 2006 through August 1, 2007.  (Dkt. 47-1 at 2)

As a claims-made policy, the Policy provided coverage for liability provided that:

> <u>prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act or omission**, might reasonably be expected to be the basis of a **claim**</u>;
> .

(Dkt. 47-1 at 7) (bold in original; underlined emphasis added)  A claim is defined as:

> [A] demand received by **you** for money or services naming **you** and alleging an act or omission, including **personal injury** or **advertising injury**, in the rendering of **professional services**. A demand shall include the service of suit or the institution of arbitration proceedings against **you**.

(<u>Id.</u> at 4) (bold in original)  Additionally, the policy makes clear that

> **You** and **your** means the **Named Insured** and **any predecessor firm** and any person who is or become a partner, officer, director, associate, or employee of the Named Insured but only for **professional services** performed on behalf of the **Named Insured** [and] any person previously affiliated with the **Named Insured** or **any predecessor firm** as a partner, officer, director, associate, or employee of the Named Insured but only for **professional services** performed on behalf of the **Named Insured** or a **predecessor firm** at the time of such affiliation.

(Dkt. 47-1 at 6) (bold in original)

In its motion, Defendant CCC asserts that "prior to the Policy's effective date of August 1, 2006, no fewer than three Insureds (Harp, Eddy, and Hitchins) had a basis to believe that Harp's acts or omission in connection with the Partins' representation might reasonably be expected to be the basis of [a] claim against Harp and/or the Firm."  (Dkt. 36 at 18)  Conversely, Plaintiffs contend "the facts known to plaintiffs on August 1, 2006 did not provide plaintiffs with a basis to believe that Mr. Harp's work for the Partins' might be expected to be the basis of a claim."  (Dkt. 37 at 19)  Based upon the undisputed

15

evidence in the record, the Court finds that before August 1, 2006, the effective date of the Policy, Plaintiff Harp and C&E partners Carson Eddy and Todd Hitchins,[6] as insureds under the Policy, had a basis to believe that Harp's acts or omission in connection with the Partins' representation might reasonably be expected to be the basis of a claim.

On February 23, 2003, Plaintiff Harp sent a letter to the IRS regarding the Partins' taxes for the 12/31/2000 and 12/31/2001 tax years. (Dkt. 47-1 at 39) In the letter, Plaintiff Harp stated the "inadvertent under-reporting of the total payments received during tax years 2000 and 2001 were the consequences of two factors, namely: (1) a misunderstanding on the part of the return preparer . . . and (2) a misunderstanding with respect to the complexities surrounding the reporting of a two-part installment sale[.]" (Id. at 40) On March 16, 2006, Ms. Partin sent letters to Plaintiff Harp and Carson Eddy stating that the Partins decided to change accounting firms. (Dkt. 36-10 at 2; Dkt. 36-11 at 2; Dkt. 37-1 at 2; Dkt. 47-1 at 44, 46)

Mr. Eddy thereafter received a letter on April 21, 2006, from an attorney representing the Partins, in which Plaintiffs were informed that "several acts or omissions" seemed "obvious" to the attorney "to rise to the level of professional malpractice." (Dkt. 47-1 at 63) The April 21, 2006, letter directed Plaintiffs to "provide a copy of this correspondence to your malpractice or errors & omission carrier, and ask the carrier to contact us as soon as possible." (Dkt. 47-1 at 63)

On May 2, 2006, C&E partner Todd Hitchins sent an e-mail regarding "Partin Settlement Issues," which clearly disclosed that he was aware of circumstances that could reasonably be expected to form the basis of a malpractice claim. (Dkt. 36-18 at 2)

---

[6] Plaintiff C&E merged with Carr, Riggs, & Ingram, LLC in October 2007. (Dkt. 38-3 at 5) At all times material to the instant litigation, Mr. Hitchins was a partner at Plaintiff C&E. (Id. at 6)

The e-mail, sent to Carson Eddy and copied to C&E partners, Jennifer Christensen, Plaintiff Harp, and Vic Incinelli, stated:[7]

> Carson:
>
> I understand you, Ed and the parties may be working towards a resolution, which is great news. I have some concerns, some of much greater importance than others.
> . . .
> How will we ensure the opposing attorney is dismissed? Knowing this type of attorney, he will not walk away from what he sees as an easy paycheck without a fight. I assume he will try to convince the Partins they were under duress – we should act as if everyone will be subject to future depositions concerning this.
>
> My biggest concern – what is our obligation to the insurance company. We need to review the policy carefully, and ensure will be not be in violation concerning this. Worst case scenario is we think we have settled, the attorney comes back later with claims of duress, damages, etc. The insurance company refuses to cover us because we did not timely notify them of this problem. We then have caused ourselves a much bigger problem – who pays for this defense and damages?
> . . .
> I think this [insurance] issue should be addressed before we meet with the Partins. Even if we have to notify the insurance company, we can simply tell them our resolution efforts and the results of them. I just want to ensure we don't end up without insurance coverage on this.

(Dkt. 36-18 at 2; Dkt. 47-1 at 83) In a response e-mail, Carson Eddy stated:

> We have been through this before. I will discuss the situation with Jesse Graham Sr. before any meeting with the Partins. In the past we have not notified the insurance company prior to an actual filing. I will call Sandy, our liability insurance agent and inquire once again regarding the notification issue. I don't want the insurance carrier's attorney getting involved prematurely.

(Id.)

The Court finds that, prior to the inception date of the Second Policy, the foregoing events conclusively demonstrate that Plaintiffs had reason to believe that the Partin

---

[7] Carson Eddy, Jennifer Christensen, Vic Incinelli, and Plaintiff Harp were also partners at Plaintiff C&E. (Id.; Dkt. 38-4 at 5) Mr. Harp left Plaintiff C&E in December 2006. (Dkt. 38-4 at 5)

family might file a claim against Plaintiff C&E.  More importantly, the Hitchins e-mail irrefutably shows that a malpractice claim was actually foreseen by at least one partner at C&E and that this concern was shared with other C&E partners.

In this regard, the Court finds this matter indistinguishable from <u>Coregis Insurance Co. v. McCollum</u>, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997). In <u>Coregis</u>, the court addressed the language of an exclusionary provision which stated "coverage will not be afforded if at the effective date any insured under the policy knew or <u>could have reasonably foreseen any claim</u> arising out of any act, error, omission or personal injury that <u>might</u> be expected to be the basis of a claim or suit."  <u>Id.</u> at 1279 (emphasis added).

Prior to the policy's effective date, an associate at the insured law firm wrote a memorandum to one of the firm's partners documenting her belief that a former client might file a malpractice claim based on the firm's representation of that client in a federal court action.  <u>Id.</u> at 1576.  The plaintiff, a professional liability insurer, sought summary judgment on the basis that the associate and the firm knew a month before the effective date of the policy that a malpractice claim might be filed by their clients but failed to disclose this information to the insurer.  <u>Id.</u> at 1575-76.  In granting the insurer's motion for summary judgment, the district court concluded that "[b]ecause no insured under the policy informed the Plaintiff of this information or attempted to correct the application for the policy, Defendant McCollum and the McCollum firm are precluded from coverage for the underlying malpractice claim."  <u>Id.</u> at 1579-80.

Here, as in <u>Coregis</u>, the policy contained a "prior knowledge" provision that conditioned coverage on the insureds' having no knowledge of an act or omission in the

provision of professional services that might reasonably be expected to be the basis of a claim. As in Coregis, internal communication here reveals concerns on the part of an employee of the insured that a claim might be filed. Finally, as in Coregis, insured C&E declined to notify its insurer prior to the effective date of the policy of any concerns regarding a potential claim. The court in Coregis recognized that the exclusionary clause at issue did not require that "that such a claim have merit or that the insured reasonably believed it to have merit." Coregis, 961 F. Supp. at 1579. All that was required was that the insured be "aware of circumstances that might lead to a malpractice claim." Id.

As in Coregis, the Court here finds that, regardless of the subjective beliefs Plaintiffs claim now to have held, the language of the Second Policy precludes coverage for the Partin claim because several insureds objectively "had a basis to believe" that the "act[s] or omission[s]" of Plaintiff Harp "might reasonably be expected to be the basis of a claim" prior to the inception date of the policy. (Dkt. 47-1 at 7)

Having concluded that no coverage exists for the Partin claim based on the plain exclusionary language of the Second Policy, the Court need not address the parties' cross motions for summary judgment as to whether the April 21, 2006 letter to Carson Eddy at Plaintiff C&E constitutes a "claim." (See Dkt. 36 at 13-17; Dkt. 37 at 13-18)

### III. Conclusion

For the foregoing reasons, the Court finds no basis for coverage for the Partin Claim under the First Policy or the Second Policy. Accordingly, it is hereby **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (Dkt. 36) is **GRANTED;**

2. Plaintiffs' Motion for Summary Judgment (Dkt. 37) is **DENIED**;

3. The **CLERK** is directed to **ENTER JUDGMENT** in favor of the Defendant consistent with this Order and Rule 58 of the Federal Rules of Civil Procedure, **TERMINATE** all pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Orlando, Florida, this 16 day of May 2011.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record